Good morning. Thank you. You may be seated. Judge Heitens and I are happy to welcome Judge Groh, a District Court Judge from the Northern District of West Virginia, presiding with us today. We're going to hear two arguments today, starting with Sacks Holdings v. Grin Natural. Ms. Elings? Good morning, Your Honors. I'm Gail Roxanne Elings of Davis Wright Tremaine, appearing for the appellants. It might just be me, but yeah, there you go. Move the mic. Thank you. As the District Court noted, the facts in this case are straightforward and undisputed. Grin made two bona fide sales into the United States Commerce through a public foreign website before Sacks filed its intent-to-use trademark application. Would you describe two bona fide sales as deliberate and continuous? I would say that deliberate and continuous means bona fide, not what the District Court held it to be. Is that what we said in Larson? That's what you said in Larson. That it's bona fide? Well, what's disputed is the law, specifically what constitutes using commerce sufficient to establish priority. What I'd like to do is, I mean, I think Sacks' position is that definition of use in commerce is irrelevant, and this Court should instead apply common law principles. According to Sacks, the District Court need not have considered whether Grin's sales were in commerce or bona fide. Sacks asserts that because its intent-to-use application matured into a registration with a priority date of August 1, 2017, and enjoys the presumptions under 1057C. Therefore, Sacks, and that's the Lanham Act, therefore, Sacks contends Grin must prove its two online sales created common law rights requiring not just bona fide in commerce sales, but that they were deliberate and continuous, not sporadic, casual, or transitory. So Grin's position is different. This Court must look to the Lanham Act itself, specifically the definition of use in commerce in 1127, the priority rule. So I think I know the answer to this, but in order to say everything you're about to say, we would have to say that Zazu is just straight up wrong, right? Like the position that you're asserting is irreconcilable with the Seventh Circuit's decision in Zazu. That's correct. Okay. And the priority rule in 1057C1, and this Court's precedent, it goes against all of that. Those decisions all recognize that deliberate and continuous, and some of them dealt with deliberate and continuous, some dealt with sporadic, casual, or transitory, describes bona fide use, genuine commercial activity. Under that framework, Grin's bona fide U.S. sales before he was. . . I'd go back to my first question, rephrased a little bit. How is two sales prior to 2017, when appellant was not marketing in the U.S. market, how does that equate to deliberate and continuous? So if I could, that equates to deliberate and continuous means bona fide. It means bona fide. Well, what was deliberate about two sporadic sales prior to 2017 when appellant was not marketing to United States customers? There is nothing in the statute that states that you have to market. Okay, so what was deliberate about those two sales? That you paste it into commerce with the trademarks on the products themselves. It is part of their ongoing commercial transactions, their business. And two sales equals continuous? Two sales, what has happened is continuous, that was discussed in simply wireless, right? Continuous simply means . . . I don't want to answer the question about continuous. Under our cases, or at least some of the cases that I read, the flip side of continuous or bona fide use is something called token use. Yes. Give me an example of what you think is token use, because it sounds like two sales over a Facebook page might be . . . So what do you think token use means? So token use is . . . you can look to the case law for token use. I'm asking you to give me an example. So an example of token use is where sales are made without the mark on the goods. Okay, so if in Zazu they shipped goods, but they did not put the marks on the goods until after the L'Oreal . . . And what's the authority for that definition of token use, that it at least does not accord with how I understood the word token use? The other part of token use is if it's not public, right? If it's made an intercompany sale. Token use, before the TLRA was amended, token use was allowed for registration. For registration. That's correct. But not that you got a trademark. That's correct. If you registered, it did. But today, there's no difference. There's no difference. Well, again, this is the part that's just irreconcilable with the Seventh Circuit says and that. So it's a very stark decision. There is literally no way to adopt your position without saying that an extraordinarily high-profile Seventh Circuit decision that I'm reliably told is in trademark casebooks is just flat out wrong. So which Seventh Circuit are you talking about?  Zazu. Zazu is . . . I'm reliably told by at least one of my law clerks that that case is literally in trademark casebooks. It is. It is. And it's pre-TLRA. So pre-TLRA, the Lanham Act was amended to get rid of the two-party system. So if I could say, Section 45, codified 1125, sets out Congress's purpose.  They're saying it's not relative. Wait, doesn't Zazu post-date the statute you're talking about? No, not the use in it. The decision is, but they were deciding on facts prior to the TLRA. So they applied the law as it was prior to the TLRA. Okay, so let's entertain this, that the text of the Lanham Act does this. Why would Congress have used . . . In Section 1057C, why did they use the word . . . Why would they have chosen use the mark, not use the mark in commerce? Why would they . . . You're basically asking us to equate two definitions, one of which says in commerce and one of which doesn't. Am I right about that? I'm not sure I understand what you're asking. Okay. So in 1057C, do we agree the statute says used the mark? In 1057C, is the intent to use . . . Intent to use the mark. Not use the mark in commerce, intent to use. That's what the statute says? That's because what the amendment said was, rather than have this sort of two-tiered system where you could get a registration without using it in commerce, just by shipping it interstate, as long as you used it. They just, they got rid of that. Instead, they said, okay, you can come in and file an intent to use, and once you use it, you will have priority as of the date you use. The exception to that is 1057C1. And that says, except as to any other person who has used the mark in commerce before you did. I just want to, if I could, I want to talk about this 1127, because I think it's really important here. 1127 says, and I quote, Use in commerce means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark. For purposes of this chapter, for purposes of this chapter, a mark shall be deemed to be used in commerce on goods when, and now I'm just paraphrasing, when the mark is placed on the goods, and the goods are sold or transported in commerce. Congress specified, for purposes of this chapter, that chapter's chapter 22 of title 15. That's the entire Lanham Act. So 1127's definition applies across the Act, not just registration. It makes structural sense. Every key enforcement provision, 1114, infringement of a registered mark, 1125A, unfair competition of false designation, including unregistered marks, 1120C, dilution, and so on and so forth, all turn on whether a mark has been used in commerce. Except the statute 1057 does not use the words used in commerce, right? 1057 does use. It uses used. It says intends to use. It does not say used in commerce. That's correct. Except you have to go to 1057C1. There's an exception. If you, even though you apply for an intent to use trademark, if someone else has used a mark in commerce, in commerce, placing trademark on the goods, and they ship in United States commerce, that is use in commerce. Single acts have been, so... So let me, okay. I had an example I wanted to give you that this sets up quite nicely. Okay, so imagine that a person produces and sells exactly one unit of a product at a farmer's market. That's the only sale they've ever made, right? That seems to me like it would be an 1127 use in commerce, right? So under your rule, that would also establish trademark rights if they had registration, right? Whether they have registration or not, it's the same. That person is a trademark, in your view. That person not, right. So literally, you sell one branded item at a local farmer's market, and you now have an enforceable trademark. Yes, if you're the first to sell it. How in the world does anyone else have notice of that? The whole point of the Lanham Act is to give people notice. And as I understand, basically, the theory of the Lanham Act is there's, like, two ways people can get notice of things. They can, like, actually know about them, or they can check the trademark registration system. But in the example you just gave me, I don't know how anyone is supposed to know, because they can't check the trademark registration system, and unless they were literally at that one farmer's market on that one day, I'm not sure how they're supposed to know that someone's using the mark. So the Federal Circuit, which is somewhat of an expert in trademark law, stated two hat sales across state lines met the use in commerce requirement. It met the use in commerce requirement. Met the use in commerce requirement for registration. Does that case say... No, 1127, there is no two uses in commerce. There is no such... Was the case about registration, or was the case about priority? It was about priority. It wasn't about registration. Which case was it? This is Christian Faith Fellowship versus Adidas. Okay? So that is... It is not just registration. Perry... I mean, there's another one. Planetary Motion. Small online software sales are bona fide use in commerce. Ours was in a public, public website. Anyone can go online and look at that. It was on Facebook. It is not done in secret. There is notice, and there was notice. But that doesn't matter. 1127 is use in commerce. Provides priority. And that is a big thing, because intent to use... You can't jump over someone else who has use in commerce. Lanham Act didn't create use in commerce. Courts did. And if you start with... Well, B&B Hardware, United States Supreme Court, said even though the Lanham Act doesn't create trademarks, it plays a vital role in protecting them. And the Lanham Act didn't invent use in commerce. It codified a century of precedent, beginning with NRA trademark cases in 1879, which held that common law, the exclusive right to grow, the right to a trademark grows out of its use. It requires no fancy or imagination. No imagination is simply founded, or no genius, no laborious thought, is simply founded on priority of appropriation. How serious was Grin's intent to use if it abandoned the application after it was rejected? But there is no intent to use. The intent to use is for registration. You're right. For intent to use. And that is different. It's all 1127. I'd like to hear... What I heard in Judge Groh's question was, how does the fact that an appellant abandoned their application impact your argument? Registration doesn't create trademark rights. Registration does not create trademark rights. You can abandon registrations. It's your use that matters. And your intent to use. Only... Abandoning that registration... If you have use in commerce... Abandoning the registration is some indication that you don't intend to use it. Isn't it? No. No. No. If you're using it in commerce, which they were, they used it not just the two times. They used it again. And then in 2018, it came through... Sorry. It came through brick-and-mortar stores and so on and so forth. None of that matters. What you're looking at is Bluebell, Allard, Chance, and Lucent. Those are cases that have different doctrines that do not apply once there's use in commerce. Bluebell and Zazu, they predate, as we talked about. That's token use. And then you have analogous use. But analogous use is where there is no use in commerce. Do you want to speak to the motion to dismiss before your time runs out? The motion to dismiss for mootness? Uh-huh. Sure. The case remains very much alive. Both parties still sell identical Grin branded goods, each holding a registration, each claiming exclusive nationwide rights, and each seeking injunctive relief. Grin sought that relief almost two years ago in February 2024. The other side just sought it in August. Leaders, a beautiful struggle. They say a case is not moot if the court can still grant effectual relief. And what effectual relief could be granted at this point? Injunctive relief. That's very important, actually. The district court hasn't entered a final judgment yet, right? That's correct. So the district court could still, in theory, enter a preliminary injunction? Yes. Okay. So, obviously, under Martinsville right now, the jurisdiction over priorities with this court. But, yes, you could order them to enter a preliminary injunction. And the trial is scheduled currently for March? For some time in March. Okay. Yes. So, I mean, I think, you know, I just want to get back to this intent to use. If you have use, you don't have to have an intent to use. Using is an intent to use.  Intent to use is if you haven't used it. That's a separate way to get rights. But the Lanham Act doesn't create those rights. Those rights are created through use. First in time, first in right. And what Sachs theory reverses, Congress meant it to run one way. Use first, rights first. Under 1051B, IQ basis, and 1057C, constructive use arises only if no one has already used the mark in commerce. Sachs starts with registration and works backward. The Act starts with use and moves forward. Whether Grin's earlier use satisfies 1127's definition isn't an afterthought. It's the starting point. And under that definition, Grin used the mark first, bona fide, and in commerce, and that gives Grin priority. This court's precedent also confirms that result. All right. Thank you. You have some time in rebuttal. Thank you. All right. Mr. Wharton. Good morning. Jacob Wharton on behalf of Sachs Holdings, Inc. I'd also like to introduce Mr. Devin Chodorow, the founder and CEO of Sachs, who's with us here from California today. May it please the court. I'd like to start with the mootness issue, if I may. Could I start with a fairly fundamental-seeming-to-me question? Certainly. Do you know any court that has ever said that the district court's grant of partial summary judgment renders a preliminary injunction moot? We've not found a case that says that, Your Honor. In fact, hasn't – and because, isn't it black-letter law that the purpose of a PI is to allocate the risks between the parties until the entry of a final judgment? I know we've said that. I've written an opinion that says that. Then I'm going to certainly agree with you, Your Honor. I mean, our approach – So how is it moot? There's no final judgment. Well, I mean, right. Has the district court entered a final judgment in this case? No, Your Honor. So how is this possibly moot? The concern that we have is more of a practical concern in that – Practical concerns are not Article III mootness. If there were to be a reversal and remand of the preliminary injunction order, that would be at odds with the partial summary judgment. Sure, and I guess – I don't know how to say this as delicately as I can. I'm not bound by the district court's partial summary judgment order. Understood, Your Honor. So I'll move on to the trademark issues. I'd like to note that this is essentially a tale of how two different companies pursued trademark rights. One is about Saks, a U.S.-based business that filed an intent-to-use application. It took the requisite steps to obtain that registration and since has been a successful disruptor in the oral health care products area. The other is a foreign business that for years did not attempt to secure any rights in the U.S., did not focus on the U.S., and even allowed a trademark application naming the U.S. to go abandoned. The district court expressed the issue in this case as whether two casual, almost accidental sales into the U.S. made via a New Zealand website in New Zealand currency was enough to establish a party's U.S. trademark rights. Saks agrees that that should be the issue and that there are even additional undisputed facts that should be considered. So can I ask you a part about – so I assume in contrast to your friend on the other side, that you think that Zazu is completely right and we should 100 percent follow it? Yes, Your Honor. Okay, so then can I ask you about a question about a statement in Zazu I want to see if you agree with? So Zazu also, in addition to this framework that I know that you agree with, Zazu also says, quote, whether use is sufficient to grant rights in a MARC is a question of fact on which appellate review is deferential. Do you agree with that? Yes, Your Honor. Okay. So that seems like it helps you on the PI and hurts you on the summary judgment, which I know is not before. So you think that the question of whether or not there was sufficient use is a factual question? Yes, Your Honor. Okay, and so you think that we should affirm the district court's denial of the PI because the district court found that this wasn't and that we owe the district court deference? Correct, and that factual finding would be reviewed for clear error. You see how this might potentially create a problem down the road of how the district court was able to grant summary judgment in favor of your client? Yes, Your Honor, I do. We fortunately have the benefit of a fully developed record at the summary judgment proceeding. That was more developed than at this PI hearing? Yes, Your Honor. Okay, and I guess that's a problem that if it comes up, will come up in the future, so. Correct. I do want to note what the district court based its order on. That before SACS filed its intent to use application, appellants sold a few tubes of toothpaste and a couple of toothbrushes from appellants New Zealand website. The sales were unsolicited. This is from the district court's PI order. The sales were in New Zealand currency, and appellants were focused on selling their products in New Zealand. And opposing counsel says that that's enough, that that's sufficient, and highlights at least this federal circuit case, Christian Faith, where there was a sale of two hats out of state, and I guess she analogizes that to what we have here. What's your response to that? Yeah, Christian Fellowship is a case that reached the federal circuit after a TTAB, a Trademark Trial and Appeal Board, cancellation proceeding. The question there was whether the sale of these two hats actually constituted a use in commerce. Which matters for registration purposes. Which matters for registration purposes, yes, Your Honor. And in that case, they looked into whether a small church, I think it was on the Illinois-Wisconsin border, happened to sell those hats across the state line. They needed something to hang their hat on, no pun intended. So just again, I think fundamentally it seems to me that this argument is down to just a categorical difference of opinion between the parties about whether the Seventh Circuit's idea in Zazu that there's like the thing that gets you the trademark and the thing that gets you the registration and whether that's right or not. But just, so accepting Zazu's formulation for a minute, you're saying the federal circuit case is in bucket two. It's not about whether you have a mark. It's about whether the mark, it's protection under the Lanham Act is being registered. But that's a Lanham Act case, not a rights case? I would characterize it slightly differently in that that's a sufficient use for registration purposes versus a sufficient use to establish trademark rights. That's what I meant to say. You said it more clearly than I did. But yes, thank you. I agree with that basic dichotomy there. And I, you know, speaking of registration, one reference that I would refer the court to is even the trademark office itself has addressed this issue and has opinions from 2017 and 2023. I would direct the court's attention to the trademark manual of examining procedure section 901-02, where this is from the trademark office. It states that, quote, sporadic, casual, and nominal use does not meet the standard of bona fide use in the ordinary course of trade to support a registration. So we even have authority from the trademark office itself saying that there has to be something more than this random accidental sale. There must be some intent there. Going back to some of the facts that the district court relied upon, that the appellant's sales were casual with little importance attached to the time and almost accidental, that the appellants offered no evidence beyond vague generalities that it had in the intent, that it had the intent in the summer of 2017 to market products into the United States at that time. And the district court noted that appellants demonstrated a lack of serious engagement until 2020 when a dot-com website was launched. Appellants point to nothing in the record to contradict these findings. I also want to point out to the court that appellants cite to the summary judgment order throughout their briefs, and so I think there's a question of what record this court relies upon at this stage. Is it stop at the P.I. briefing? Or because we have... Why wouldn't it? I mean, if we're reviewing the district court's decision to deny the P.I., why would we look at anything other than what was before the district court when the district court decided to deny the P.I.? And that's Sachs' position. That's Appellee's position, Your Honor. It's just that we have a unique procedural posture here and that this case filed in December of 2023. The answer was in February, I believe, of the next year. Unfortunately, the district court judge to whom the case was assigned, there wasn't a lot of activity. And the case was reassigned to Judge Catherine Eagles, and at that point, orders started coming quickly. And so we have a unique procedural history here where the P.I. order was followed only several weeks later by the partial summary judgment order. So I'm not sure... To answer your question, Judge Heitens, I'm not sure we'll get another one that looks exactly like this where you have a fully developed record. But to the extent that that additional record is considered, there's... Like I was saying earlier, I think looking ahead to summary judgment, we have additional facts developed in the full record that help support not only the court's decision on the P.I. order, but also on the summary judgment order, which I realize is not before this court today. Essentially, my colleague asked this court to overturn longstanding law. They cite 215 U.S.C. Section 1127. But that section is a definitional section. It defines terms. The definition of use in commerce determines what conduct falls under the purview of the Lanham Act, thus under Congress's Commerce Clause. The definitional section, just like the rest of the Lanham Act, does not create any trademark rights. It merely defines the type of use that would potentially allow rights to be created, either by common law or through a registration process. Congress amended Section 1127 in 1988 to exclude use made merely to reserve a right in a mark. Commerce made that change because the same amendments introduced the intent to use application at that time. That device allows applicants to lawfully reserve rights to a mark without the need to resort to token use. A token use, to answer your Honor's question earlier, in general I would say it's a use that would be a contrived sale, just to say that a sale occurred. The amendment was meant to address the situation where you sent your cousin a package in Ohio across state lines, and it wasn't a true use in commerce at the time. That could be a token use. So now instead of doing that and sending the package to your cousin, you could go to the Trademark Office, file your intent to use application, like Sachs did in this case, and then take all the requisite steps to obtain a full registration. Sachs still had to use the mark in commerce at some point, and they did. You have to file a specimen of use, and then the Trademark Office grants your registration. So there still must be use in commerce, even if you're availing yourself to the intent to use application device. Sachs submit that this Court's decision in Larson governs this issue. Larson, a Fourth Circuit decision from 1998, held that, and this is critical, Sachs believes, and I'm quoting from Larson here, quote, use within the meaning of the Lanham Act is defined as bona fide commercial use in the market in which protection is sought. See USC section 1127, defining use in commerce. And such use must be deliberate and continuous, not sporadic, casual, or transitory. The Larson Court recited this standard with respect to the question of whether a party had acquired common law trademark rights. But in your view, I mean, it's probably loose dicta, so I'm not sure it's fundamentally a problem. But in your view, that that citation to 1027's definition of use in commerce was actually not really on point, because if we're talking about use for purposes of getting rights, we shouldn't really be using the use in commerce definition? Sachs's position is that- Is this a yes or a no? I'm sorry, could you repeat the question, Your Honor? It seems to me that under your scheme of things, that citation was a little bit off point, because if what the court was actually talking in that case was about use sufficient to establish rights, it wouldn't necessarily, it's not necessarily germane to quote the definition of use in commerce for purposes of registration. No, I think it is, Your Honor. Okay, explain. No, and I think it can be reconciled. Okay. And I agree that there's some tension here between the statutory definition- I just read Zazu, and Zazu goes out of the way to say these are fundamentally different things, and then we have this citation in Larson that kind of starts to equate them again. I agree, and this is somewhat difficult to reconcile, but I think the way it can be reconciled is that you get this definition from Section 1127. That's going to tell you what kind of use could create trademark rights, and it's distinguishing a use in commerce, obviously bringing in all of the Commerce Clause jurisprudence with that, and it's distinguishing it from a token use. That's why Congress changed that use. So what Larson stands for, SACS submits, is that you have to first have a genuine use, but then that use, that gets you started. That doesn't get you across the finish line. You have to then take that type of genuine use and be deliberate and be continuous. So you could be deliberate, going back to my token use example, Your Honor, you could be deliberate about sending that package to your cousin in Ohio. Assume it wasn't an accident. Right, you did it for a reason. Right, but that would still be a token use, so you don't have the type of genuine bona fide use in commerce in the course of trade. All of that is actually in the statute's definitional section. It's not just use in commerce. It's use in commerce in the ordinary course of trade, and it very well may be that that deliberate and continuous requirement that Larson and other circuits have required is that's what's enveloping that definitional section. If you're going to have use in commerce in the ordinary course of trade, it has to be more than Your Honor's example of a single use at a farmer's market. It has to have some modicum of intention. It has to have some effort behind it. And Sachs submits that what happened here are these accidental and casual sales from a foreign website with no evidence of intent to enter the U.S. market. We've got all that other evidence saying, oh, they came in 2020. They let the trademark application go abandoned. If this court were to adopt appellant's reasoning, it's almost as if an item marked with a trademark, if it entered the stream of commerce from anywhere else in the world, it crosses from one sovereign jurisdiction to another, and even if there was no intent, if it came from New Zealand or Japan or Indonesia and it just happens to be a one-off sale like we're seeing here, that that somehow would create common law trademark rights. Sachs submits that stands at odds with Larson. It would also reward a company who didn't take the steps to get a trademark application. They could have and probably should have filed an application earlier. According to the facts submitted by appellants, the company was founded in 2015. They didn't end up filing that later trademark application until 2017, and then that's the one, Judge Groh, that they allowed to go abandoned. So Sachs, on the other hand, took the steps to file an intent-to-use application, took all the requisite interim steps, used the mark, and obtained it today. Let me address another issue that seemed to come up earlier, and that was the sufficiency of use and public use. And my colleague rightfully stated that the website was public, the Facebook was public, but anyone in the world can create a website or a Facebook page, and merely allowing that creation alone and a random sale to create trademark rights in the United States would put every company in Sachs' position who did do what they needed to do. There would be no way for Sachs in August 1st of 2017 to figure out whether that company had made two sales into the U.S. or not. So there has to be not just this modicum of intent, not just this modicum of continuity, but there must be some outward appearance that, hey, this other party is claiming trademark rights in my jurisdiction. I need to be on notice of that. I do want to point out what the district court did actually require here because appellants, I think, misstate what they actually required. What Judge Eagles did require here is marketing intent and subjective intent, continuing effort, and continuous commercial utilization. And Judge Eagles cited Larson for the deliberate and continuous, not sporadic, casual or transactional intent. And I just keep coming back to I don't know. I mean, I think the PI is probably fine. I just don't understand how you can possibly grant summary judgment if that's the test. And we'll see if we're here again later on down the road to address that, Your Honor. I do understand where you're coming from with that. But I also want to point out what Judge Eagles did not require. She did not require a sales threshold or sales volume. She did not require market penetration, a more stringent test applied by other circuits. And she did not apply the analogous use doctrine. I do want to address briefly, as appellants mentioned, emergency one and simply wireless. In both of those cases, the Fourth Circuit indicated that common law determines who enjoys exclusive rights to an unregistered mark and the extent of such rights and the proper geographic scope of injunctive relief is to protect against the infringement of such rights. Both emergency one and simply wireless were abandonment cases as well. So I think they need to be considered in that context and that larceny is the controlling decision here. So in closing, SACS submits that the district court not only applied the correct law, but it did so on the correct facts as well. In other words, it didn't require a sales threshold. It didn't apply the analogous use doctrine. And this court need not, in deciding the propriety of the order on the preliminary injunction, need not decide what is a minimum quantity necessary, what is required for deliberateness and continuity. This court needs to look at, did the district court here abuse its discretion on the facts that it had before it at the time? And in doing so, this court could recognize that on those facts, that's neither deliberate nor continuous. But you do not have to decide today what quantum of toothbrushes and toothpaste is enough. Maybe that's something that comes up at summary judgment, Judge Heidens. But for today's purposes, Judge Eagle's got it right on the PI order. And I'd be happy to answer any questions your honors may have. I'm good, thank you. Thank you. Thank you. Thank you. I want to talk about other cases where there was just a sale or two sales and they were, and it's all in the brief. But you can go back to older cases, such as Katharine Erst in the Seventh Circuit. A German company sold coffee substitute to the U.S. through importers with no U.S. advertising and no local presence. That was enough. Authenticity, not extent, was the test. In Breitenberg in 1911, a few things. That was enough for what? To establish priority? That was enough to establish priority. In which case was it? That is in Katharine Erst's Malzkaffee. It's in the brief. In Waldus International Manufacturers Agency, Southern District of New York, 1916. One legitimate shipment just eight days before the arrival was enough to establish priority. Suite 16, Eighth Circuit, 1926. A small shop beat a larger chain in use. The court warned that denying rights would reward craft and cunning. In Western Stove, Southern District of California, 1949. A single interstate sale six days earlier than the competitor established priority. And what craft and cunning would we be rewarding here if we affirmed the district court? So Sachs, in this case, filed an intent to use application. He did not begin until 2020. He knew the existence of our client. And it's in our summary judgment papers and stuff that's not relevant to this. But basically, he rushed into the market. He had experience in this market. He used to be part of Plackers. He knew where to go to. And he thought, if I get out there, I will flood them. I will flood the smaller startup that started with its two sales. And then it had two more sales. And then it sold through brick and mortars. And then it followed up with the dot com. But in 2018 and 2020, correct? It – That's the timeline? Yes, but that doesn't – but they – it's just like they filed an intent to use. Their first sale is their priority date.  Their first sale is their priority date. You can get it through use or through registration in the United States. First to use. Supreme Court cases. First to use. First in right. It is not registration. And it's not intent to use. They established an intent to use. But the exception to that is someone else uses it. 1057. Look at subsection 1 under that. Unless someone else uses first. And that is the rule. It is not – it is not – what is – I'm going to say Larson looked at the Second Circuit case. The Second Circuit case, and I also basically was La Societe, Jean Pateau. And the reason those were considered not authentic use was because they were done to preserve the mark. They were not done in the ordinary course of business. Our client only has one mark. They have their goods. It was done in their ordinary course of business. And that establishes – look at Drexel, 10th Circuit, said courts as long – as courts have long recognized, affixing a mark to goods offered in commerce is itself evidence of a genuine trademark use. So there are many other that I can't get to on this, but we put many, many cases in that. Zazu is pre. Okay? That does not affect it. And the other ones, it is not about intent. Intent – Congress knew where to put intent. They put it in the intent to use when you apply for. They did not use it in use in commerce. 1127, look at that, no intent. All right. Thank you. We understand your argument. Thank you. All right. We'll come down and greet counsel and then go to our next case.
judges: Stephanie D. Thacker, Toby J. Heytens, Gina M. Groh